Good morning. May it please the court, Christy Hughes from Federal Defenders of San Diego on behalf of Ms. Duenas. Your Honor, the best witness for Ms. Duenas, the one who would have supported her defense that she didn't know there was anyone hiding in her Jeep, was the woman who, when she was pulled out of the car, said she never saw the Jeep's driver. And what else would she have said that would have helped her client's cause? Well, that would have been it. Her statement was, I didn't see the Jeep's driver, I didn't talk to anyone about payment. And the other witness said, I did, and it was your client. So I don't understand how the missing witness would have offered any material exculpatory evidence that would have assisted Ms. Duenas. Well, I think this was sort of a unique case in that the male witness's initial statement was, I didn't see the driver. And so he gets to trial, he changes his testimony, describes a driver who looks remarkably like Ms. Duenas. So the question here, I think what the material witness instruction would have allowed the jury to do is to determine, essentially, is he lying here at trial when he says he saw someone who looked like her, or was he lying earlier when he said, I didn't see the Jeep's driver? Because I think what it came down to is, without his testimony saying, yes, I saw her there, I heard her there, this is just really a should-have-known case. It was her car, she should have known there were people in it. Well, it's fine with respect to the male. He came to trial, he had a chance to cross-examine some. But with respect to the woman who was pregnant that they let go back into Mexico, not only did she not testify, but your client signed a statement concerning undocumented aliens saying that she didn't think that person had any information regarding the case. I mean, I find it hard to believe that there was anything that would undermine that. I mean, she didn't see her, didn't say she saw her, the driver didn't think she saw her. She really has no knowledge about it one way or another. How could it help? And more importantly, do you have any evidence that the government used this deportation as a kind of a way to get around some appropriate due process rights for your client? I'll answer that. There were sort of three parts to that. Yeah, I understand. I don't like these. Sorry about that. No, that's okay. I just want to make sure I remember them all. So the waiver, I think, goes to the constitutional and due process, so I'll talk about that in a second. I think how it would have been favorable is, again, it would have not only undermined the credibility of the male witness, which you're right, we did have an opportunity to cross-examine on, but it would have allowed the jury to see that actually the statement that he gave when he was first pulled out of the Jeep, that he didn't see anyone there, he didn't see the driver, that lined up with the other witness's statement that she didn't see the driver either. They both had a similar vantage point when they were loaded in. They were loaded in at the same time, and so the fact that both material witnesses gave consistent, gave the same statements of, we didn't see the driver, we didn't see anyone there, would have allowed the jury to completely discredit his testimony. You know, when there's two people testifying consistently, it's more likely that that is the true statement. And then we're back to that situation of, it's just a should-have-known case. I mean, she consistently, Ms. Wing has consistently denied knowledge. This was a hidden compartment. The male material witness himself said when they told him he was going to be smuggled in that Jeep, he was shocked because he didn't know where he was going to fit. The agents that discovered this compartment were actually told to look for a compartment. So it wasn't really as strong of a case, I think, as the government claims. It really was, this was her car. She should have known there were people in it. Getting to the waiver. Was that because the floorboard was raised in the back as a result of these special compartments? I believe that the bottom sort of sunk a lot lower than it should have under the car. Right, but my question was, was there any detail by looking at the interior that there was something unusual about the height of the floorboard in the back of the car? The agent testified that he owned the same Jeep, and so he thought there was sort of a strange discrepancy between where the floorboard was and where the bottom of the compartment was. Does that mean the same thing? Maybe I'm not making my question very clear. But, you know, when you look in the back seat of a car, you can see the rise from the drivetrain shaft that's underneath the car. As I understand these compartments, they would actually have raised the floorboard where the passenger's feet would stand because you'd have to have space not only below the floorboard, but above it in order to fit these two rectangular storage compartments in there. My recollection of the record, and I was in trial counsel, so the government counsel may have a better recollection. I'll call that. My recollection was that it wasn't a large raise. It was more that it didn't look like a factory compartment. The carpet was a different color. Sort of strange things that this agent who had that kind of car said, oh, this doesn't look right. This isn't what my car looks like. Well, it's not as high as I read the record, right? That's a pretty small compartment. It was a small compartment, yeah. So these were little Elliot. They were tightly packed. Tightly packed, okay. Like sardines. Well, it's very sad. Getting to Jed Smith's question about the waiver, and I think you were asking about the bad faith and the tactical advantage. Yeah. I guess what I was pointing at, your client signed the document basically saying, it's okay, no problem, she can go back. Then now you're raising the issue of, you know, did the government do this in bad faith? What evidence do you have of that? Is there anything in the record when you combine what your client signed, and at least from what I gather is a paucity of any statement on your part, that the government acted in bad faith? Well, two responses. First, regarding the waiver, we don't even get to the waiver question until we determine whether or not Ms. Wing has had a right to these aliens. So we have to go through your other question of was there prejudice and was there bad faith. And regarding the waiver, the district court never made a finding that this was a milling or intelligent waiver. I mean, she said, I never saw those people in the car. I didn't know they were there. So I don't know how she could identify what favorable testimony they would have for her. But regarding the bad faith, you know, one way to show bad faith is whether or not the government did this to get a tactical advantage at trial. And here, I mean, when they pulled this woman out of the Jeep, they knew that she couldn't identify the driver, hadn't seen anything. So she wasn't a favorable witness for the government. She arguably had testimony that would support Ms. Wing's claim that she had just told agents, I didn't know these people were in my Jeep. This woman would have backed up that story because she didn't see her there. Well, and I'm not sure of that, but what do you do with the issue of harmless error? I mean, there's a whole lot of evidence in here, including cell phone records and what they observed, her conduct, all of those sorts of things. And, of course, the testimony of the male occupant. You cross-examined, the trial counsel cross-examined him, tried to show that his story was inconsistent and the like. I just, how do you get past the harmless error issue? Well, I think this is a unique case because of the changing story. And so what was really important about this witness is she allowed the jury, with this instruction, to see, okay, someone else had given the exact same statement that he gave when he was first pulled out of the Jeep, which was, I didn't see anyone. Didn't defense counsel get to argue that to the jury? They did. But I think, I mean, as this Court and other courts have recognized, defense counsel argument especially can be and is disregarded by the jury. A judge's jury instructions, those are binding statements of law. Jury instructions are taken back into the jury deliberation room. The jury can consult them. Juries are told, you know, at the end of instruction that they can disregard anything counsel says. That's just argument. And so I don't think that where knowledge was the main, I mean, the only issue in this case. Well, I don't think we're going to take judicial notice of the fact that juries disregard what defense counsel says in closing argument. I don't think he wants to do that. Well, they are told that, you know, what counsel says is just argument, right? Sure, sure, sure. So, I mean, this Court knows that. I mean, really, I think what's important is this was the issue. She wants to go a little further. I think that where the issue, the only disputed issue is knowledge, I think having a judge instruct on the binding law would have affected the jury verdict. To Judge Smith's question on harmless error, it's more than just the two witnesses, isn't it? We have to look at the totality of the evidence, which includes the cell phone records, the testimony by the ICE agent who owned a similar Cherokee, that this was, you could tell by looking at the vehicle that there was something unusual about it. All that goes into the harmless error analysis, does it not? I do, and I think, again, we're back to that should have known. I think that, I mean, the star witness for the prosecution was this material witness who changed his story. That was really what put her there, sort of at the scene of the crime when they were loaded in. He said, I heard her, I saw her. That, I think, allows the jury to conclude, okay, she was there, she knew it. Other than that, they're sort of wondering, I don't know, it's her car, did she really see it? She was there. There's no question she was there. Was there? The only testimony that she, well, she was there at the port, but the only testimony or evidence that put her there when they were loaded in was this male witness. I mean, that was really the only thing that conclusively proved, okay, she knew because she was there while people were being loaded. He testified she saw it. Right. Okay. You've almost used your time. Okay, thank you. Thank you. Good morning. Sabrina Febb for the United States. I'll begin by responding to Judge Palmer's questions just about the record so we're all on the same page. As you recall from the record, the compartment itself was about 10 inches deep, and the floor of the Jeep itself was not raised, but what had happened is that the rear of the Jeep was actually raised, and they put blocks in on the springs. So what you could see in some of the photographs that were submitted to the jury is that the wheel well of the two rear wheels of the Jeep were substantially higher. So it was like they were jacked up. Exactly. And so when we inspected the vehicle with Federal Defender's Investigator, what they saw is that these blocks were literally put into the springs to keep the rear of the Jeep elevated, and then what you saw underneath the Jeep was that these two kind of coffin-like compartments had been jerry-raced so that there were two boxes and the tailpipe had been kind of re-engineered to run between the two of them so that there was clearance. But what I want to return to is the record. When defense counsel spoke to you about who gave testimony about the appearance of the Jeep, the impression I was left with was that she was relying solely on the testimony of Officer Avila, who was the third government witness to testify. But Officer Avila was actually one of the officers who responded later. The government also presented testimony from the primary officer and the secondary officer, both of whom testified that to them it was very apparent early on that there was something wrong with the car, and that was before they even actually looked into the interior. What the primary inspector said is he went behind it, he looked down, he saw this box, and he thought, hey, what's going on? And the secondary officer saw the box right away. He just couldn't figure out how to get into the access panel. So it was when Officer Avila came down, and he's the one who had had the 87 Jeep, so he was very familiar with the 88 Jeep, that he said, I know where the jack compartment is, so let's get the rear bench out of the car, and that's when they found the access panel pretty quickly. Now, if there are no questions about the record, other than kind of clarifying who gave testimony in addition to Officer Avila, I want to return to the testimony of the male material witness, because it wasn't just that he said he saw her. He also gave details. He said repeatedly that he was warned not to identify the driver of the car, and that he was scared. And the fact that he was scared was corroborated by Officer Avila's testimony, which is that when he took the material witness out of the car, and even later he was whimpering, and that's in the record. So as we sit here and kind of conjecture on what Ms. Leti Candelario, the material witness who was removed, would have said, I think it's important to emphasize that it's really speculation on our part. The two material witnesses said the same thing, and there's no reason to believe that she didn't receive the same warning and wasn't scared just like the other material witness into saying nothing immediately after her apprehension. So returning to the point that, you know, Your Honors keeps seem to be raising is how is the testimony of this particular witness exculpatory? How can you show prejudice by not having her here? And I would submit to the Court that there really is no good way to show that. And the showing, the burden of making the showing rests with the defense, and I submit that she just can't do it. Because here, as Judge Lorenz said when he reached his decision, both with regard to the missing witness construction and with regard to the motion to dismiss, he said, she's not going to say anything that gets the ball down the field for either of you. It's a neutral watch. We're left to argue the rest of the facts and to cross examine the witness that is here. And, you know, with that, I'll submit on those two issues unless the Court has further questions. Finally, turning to the third question, I'll submit on the government's papers, I submit that that issue is squarely foreclosed by both Kimbrough, but more importantly by this Court's recent decision in Whip, which was submitted in August of this year. This is your sentencing? This is the argument that the parsimony principle trumps the mandatory minimum. Yeah. And so if the Court has no further questions on that, I'll suspend my briefing. Thank you. Okay. Thank you. Would you like to respond briefly? In my 19 seconds. We'll give you 30. I just think that where the prosecution, the witness that we're talking about here is the prosecution's star witness. It wasn't just a neutral watch. Had he only given his testimony at trial and hadn't given the prior inconsistent statement earlier, maybe we would be talking about a neutral watch. But here, they gave the same exact statement when they were arrested, and the fact that the jury didn't know that, I think, more than likely contributed to their verdict. Thank you. Thank you, Kelsey. The case just argued is submitted for decision. We'll hear the next case, which is United States v. Alvarez-Espinosa.
judges: Schroeder, Tallman, Smith M.